[Civ. No. 6847.   Fourth Dist.   Sept. 7, 1962.]

GLENN P. GRAF, Plaintiff and Appellant, v. MARVIN
ENGH TRUCK COMPANY et al., Defendants and Respondents.

George E. Shibley, Margolis & McTernan and John T. McTernan for Plaintiff and Appellant.

Miller, Nisson, Kogler & Wenke for Defendants and Respondents.

GRIFFIN, P. J.—Plaintiff-appellant Glenn P. Graf brought this action for personal injuries occasioned by a three-car collision against defendants-respondents Marvin L. Engh, individually, and doing business as Marvin Engh Truck Company, and against his driver, Orlo G. Enderson, and Jose F. Navejos.

Mr. Engh died before trial and his widow, Phyllis N. Engh, as administratrix, was substituted in his stead. Defendant Navejos cross-complained against plaintiff Graf and defendants Engh and Enderson. The jury returned a verdict for Navejos against Engh and Enderson for $750. Navejos appealed, but apparently his appeal has been abandoned and it is not here involved. A jury trial resulted in a verdict for plaintiff Graf and against defendants Engh and Enderson for $1,000. A motion for new trial by plaintiff was made on the ground that the evidence was insufficient, in that the damages awarded were inadequate. The motion was denied. Plaintiff appealed on this ground alone.

### MATERIAL FACTS

The three drivers were the only eye-witnesses to the accident. It happened about 6 a. m. on November 24, 1958. There was a heavy fog and it was still dark. All vehicles were eastbound on Cerritos Street, east of Los Alamitos Boulevard, in Orange County. The Navejos car was leading. The car driven

by Mr. Graf was following it. The Engh truck and trailer driven by Enderson was following the Graf vehicle. Navejos testified that he was traveling about 15 miles per hour and intended to enter his place of business by a driveway which was to his immediate right; that he put on his right-turn signal about 75 feet before he intended to turn. He said the Graf car struck his car twice and moved it about 20 feet. The lights on all cars were burning.

Graf testified that he first saw Navejos' car at the outer limit of his visibility, at right angles to the road, and it was standing still; that he slammed on his brakes and brought his car to a stop about one car-length from the Navejos car; that his car was struck in the rear by defendant Engh's truck after he had come to a complete stop, and the front of his car then collided with the rear bumper of the Navejos car.

According to Enderson, the truck driver, the fog became thicker as he approached the scene of the accident. He testified that he slowed down to 20 to 25 miles per hour; that he had 20 feet of visibility and then saw the lights on Graf's car and it was then standing still; that he immediately applied his brakes and turned to the right and his truck hit Graf's car and drove it about 8 feet; that he was aware of the presence of the Navejos car just before the accident, but he was unable to state just where it was at the time.

## INJURIES

Plaintiff claims that as a result of the collision he was thrown forward and then felt a second blow; that immediately after the accident he felt nervous and cold, but had no feeling of aches or pain; but that on driving home to Long Beach about 10:30 a. m., he developed a "terrific headache," pain in his shoulders and low back, with a swelling and pain in his stomach, and on arrival in Long Beach he consulted with his family doctor (Dr. Jack Rabin). He testified that the doctor examined him and took X-rays and diagnosed his condition as flattening of the lordotic curve in the neck and a tilting of the cervical spine to the left; that the X-rays showed arthritic spurring in the low spine to the extent of a bridging of the intervertebral space at L-1 and D-12, and that this condition would make that part of the body more susceptible to injury resulting from sprain and would slow down the ability of the body to recuperate from sprain; that a gastro-intestinal study demonstrated blood in the stool and X-rays revealed an inflammation of the duodenum representing very early stages of a developing ulcer; that there was a sprain of the

neck, the thoracic spine, the low back, and contusion of the right leg and thigh, with traumatic thrombophlebitis in the latter, sprain of the right shoulder, aggravation of the duodenal ulcer and aggravation of bronchial asthma; and said that all of these findings were, in his opinion, related to the rear-end automobile collision of the day before, and that the asthma and ulcer conditions were secondary results of the accident, having flared up because of the stress. Dr. Rabin prescribed cervical head halter traction with seven pounds of weight and stated that the purpose of this was to relieve pressures on the nerve roots of the neck and to overcome the pull of the spastic muscles. He also prescribed demerol for pain and an Ace wrap pressure bandage to prevent blood and fluid from pooling in the leg, thus to inhibit the inflammatory response and the clotting response. He prescribed bed rest on a stiff mattress for the low back condition, and for the ulcer plaintiff was placed on routine ulcer medication and diet. Graf was discharged from the hospital on December 9, 1958.

Graf claimed that in January 1959 he developed complications in the shoulders; that there was a persistent spasm in the cervical muscles, with pain extending into the left shoulder and upper arm; that Dr. Rabin, his first physician, obtained a consultation with an orthopedic surgeon, Dr. Harry Alban; that Graf saw Dr. Alban until the end of June 1959 and also saw Dr. Rabin every few days for treatment and observation. It was Dr. Rabin's opinion that Graf was disabled for work from November 24, 1958, the date of his injury, to June 29, 1959, the date of his release.

Medical bills shown totaled $1,083.50. Hospital bills were in the sum of $483.57, all of which the doctors claimed were reasonable and necessary.

At the time of the accident, plaintiff testified that he was working as a boilermaker-welder and received $230 per week, and that he was off work from November 24, 1958, until June 30, 1959.

Defendant's specialist in orthopedic surgery, Dr. Jerome E. Fuchs, testified that he examined plaintiff on February 15, 1960, and that plaintiff then complained of a pain in the low back, pain in his head and neck, pain in the left shoulder shooting into his wrist; that Graf gave him the history of his automobile accident; that he conducted an examination of the cervical region of the plaintiff's neck and found no abnormalities; that he found complete range of motion; that there

was no pain when the patient was distracted, but when Graf was aware that a range of motion was being elicited he complained of pain; that there were no arthritic changes in the neck and that he conducted an examination of the low back and found that the muscles on either side of the low back were normal, the pelvis was normal and the curves were normal; that he found no muscle spasms or atrophy of the low back and found no objective signs of injury to the neck or back; that in the neck and back he found the X-rays showed no fracture or dislocation of vertebrae, and that without fracture or dislocation, a whiplash injury should clear up in anywhere from 6 to 12 weeks. After an examination of the X-ray, and on cross-examination, he testified that certainly his condition should have cleared up in three to four months because plaintiff had only minimal spasms according to the original X-ray.

It is plaintiff's contention that the award is grossly less than those damages which are incontestably the result of the accident and capable of mathematical computation on the basis of defendant's evidence as to the nature, extent and seriousness of plaintiff's injuries; that the uncontested doctors and hospital bills exceeded the amount of the award and that this would not take into consideration loss of time and pain and suffering, and accordingly the uncontradicted evidence demonstrates that the award was insufficient, as a matter of law, and that plaintiff was entitled to a new trial because the verdict was a compromise and was therefore a determination of neither the liability nor the damage aspects of the case. (Citing such authority as *Gersick* v. *Shilling,* 97 Cal.App.2d 641, 645 [218 P.2d 583]; *Clifford* v. *Ruocco,* 39 Cal.2d 327, 329 [246 P.2d 651]; *Bencich* v. *Market St. Ry. Co.,* 20 Cal. App.2d 518, 522 [67 P.2d 398]; *Hamasaki* v. *Flotho,* 39 Cal. 2d 602, 606 [248 P.2d 910]; *Provost* v. *Worrall,* 142 Cal.App. 2d 367, 374 [298 P.2d 726]; *Wilson* v. *City & County of San Francisco,* 106 Cal.App.2d 440, 443 [235 P.2d 81].)

The rule on appeal is stated in *Gersick* v. *Shilling, supra,* 97 Cal.App.2d 641, 645:

"The question as to the amount of damages is a question of fact. In the first instance, it is for the jury to fix the amount of damages, and secondly, for the trial judge, on a motion for a new trial, to pass on the question of adequacy. Whether the contention is that the damages fixed by the jury are too high or too low, the determination of that question rests largely in the discretion of the trial judge. The appellate

court has not seen or heard the witnesses, and has no power to pass upon their credibility. ▮▮ Normally, the appellate court has no power to interfere except when the facts before it suggest passion, prejudice or corruption upon the part of the jury, or where the uncontradicted evidence demonstrates that the award is insufficient as a matter of law. In determining whether there has been an abuse of discretion, the facts on the issue of damage most favorable to the respondent must be considered.''

The trial court fully considered these same questions on a motion for a new trial and denied it. It is not always necessary that a jury award any particular amount as damages in returning a verdict for the plaintiff. (*Morseman* v. *Mangum,* 177 Cal.App.2d 218 [2 Cal.Rptr. 67] ; *Chaparkas* v. *Webb,* 178 Cal.App.2d 257 [2 Cal.Rptr. 879].) ▮▮ It is not always necessary that the amount of the award equal the alleged medical expenses, for it has long been the rule that the costs alone of medical treatment and hospitalization do not govern the recovery of such expenses. It must be shown additionally that the services were attributable to the accident, that they were necessary, and that the charges for said services were reasonable. (*Gimbel* v. *Laramie,* 181 Cal.App.2d 77, 81 [5 Cal.Rptr. 88].)

To some extent, the expert medical testimony was in conflict as to the claimed pain plaintiff suffered over the period indicated. Dr. Fuchs clearly indicated that he believed plaintiff was feigning in respect to some of his complaints. He found, from his examination, although at a later date than the other doctor's examination, that there was no abnormality in the cervical region of the neck and found that there was no evidence of pain when the patient was distracted, but when the patient was aware that a range of motion was being elicited he complained of pain; and that there were no objective signs of injury to the neck or back as heretofore indicated. The jury had the right to believe this testimony. Although other testimony of plaintiff's doctors was uncontradicted in reference to their findings and their opinion that plaintiff's alleged injuries were caused by this accident, the trier of fact may reject the uncontradicted testimony of a witness provided he has not acted arbitrarily. The jury might well have believed that the hospital charges and the charges of plaintiff's doctors were not entirely related to this accident, or that plaintiff may have led them to believe that he was suffering from pain when in fact he was not. Under these circumstances, defendant

would not be liable for all of the charges incurred. There was a dispute as to the possible duration of plaintiff's inability to resume his work. Dr. Fuchs testified that the usual whiplash injury, without dislocation or fracture, should clear up in between three to four months, and that he knew of no medical reason why this whiplash injury should not have cleared up in that length of time. Just what proportion of the damage the jury allotted to claimed special damages and to general damages, we are unable to tell. █ To us, it might well appear that the evidence would justify a larger verdict than that rendered, but this is not the proper test. Conflicts in the evidence are to be resolved by the jury and are reviewable by the trial court on a motion for a new trial. (See *Morseman* v. *Mangum, supra,* 177 Cal.App.2d 218; *Neel* v. *San Antonio Community Hospital,* 176 Cal.App.2d 233, 235 [1 Cal.Rptr. 313].) █ The trial judge reviewed the matter and concluded that no new trial should be granted on this ground. As heretofore said, the trier of fact may reject the uncontradicted testimony of a witness provided he does not act arbitrarily, and it does not affirmatively appear that the jury or the trial judge, in reweighing the evidence, acted arbitrarily in the instant case.

The verdict does not, as a matter of law, suggest passion, prejudice or corruption, and the uncontradicted evidence does not demonstrate that the award is insufficient, as a matter of law.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.